IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CRYSTAL DAWN COTTER, | CV 17-60-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

On May 11, 2017, Plaintiff Crystal Dawn Cotter ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding denial of her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. (Doc. 1.) On July 17, 2017, the Commissioner filed the Administrative Record ("A.R."). (Doc. 6.)

Presently before the Court is Plaintiff's motion for summary judgment seeking reversal of the Commissioner's denial and remand for an award of disability benefits. (Doc. 18.) The motion is fully briefed and ripe for the Court's review. (Docs. 22, 25.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court hereby finds that the case should be **REMANDED** for further administrative proceedings.

## I. PROCEDURAL BACKGROUND

On February 17, 2015, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401-434, which is the subject of this action. (A.R. 172-73.) Plaintiff alleged she has been unable to work since January 18, 2014. (A.R. 172.) The Social Security Administration denied Plaintiff's application initially on August 5, 2015, and upon reconsideration on May 27, 2016. (A.R. 73-86; 87-104.)

On July 12, 2016, Plaintiff filed a written request for a hearing. (A.R. 114-115.) Administrative Law Judge Michele M. Kelley (the "ALJ") held a hearing on January 5, 2017. (A.R. 29-72.) On January 13, 2017, the ALJ issued a written decision finding Plaintiff not disabled. (A.R. 12-24.)

Plaintiff requested review of the decision on February 27, 2017. (A.R. 7-8.) The ALJ's decision became final on March 14, 2017, when the Appeals Council denied Plaintiff's request for review. (A.R. 1-6.) Thereafter, Plaintiff filed the instant action.

Plaintiff argues the ALJ committed reversible error by (1) improperly weighing the opinion of her treating therapist; (2) failing to properly consider the

consulting physician's opinion; (3) improperly discrediting her testimony; (4) failing to call an expert medical psychiatrist to testify at the hearing; and (5) adopting an RFC that was not supported by substantial evidence.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457.  In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the

ALJ's conclusions.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).  The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary.").  However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

**B.    Determination of Disability**

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C.

§§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin*., 223 F.3d 968, 974 (9th Cir. 2000)). The five steps are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III.   FACTUAL BACKGROUND

### A.    The Hearing

A hearing was held before the ALJ in Billings, Montana on January 5, 2017, and the following testimony was provided.

#### 1.      Plaintiff's Testimony

Plaintiff testified that at the time of the hearing she was living in a house in Billings Heights with a friend from church. (A.R. 38.) She stated that she was homeless, and he was the only person she could live with. (A.R. 39.) Plaintiff testified that she was currently on probation. (A.R. 41.) She indicated she had an alcohol and drug problem, but had been clean and sober for over two years. (A.R. 41-43.)

With regard to her physical limitations, Plaintiff testified that shat she suffers from debilitating migraine headaches, but they had gotten better because she was put on a medication which is effective. (A.R. 44.) She stated she has difficulties lifting and carrying things because it hurts her back. (A.R. 45.) She also described having neuropathy in her feet and right hand. (A.R. 47-48.)

As for mental limitations, Plaintiff testified she spends hours at a time organizing and straightening her things. (A.R. 50.) She indicated if certain items, such her clothing, are not the arranged in a particular way, she will take them all out of the closet and put them back in again. (A.R. 51-52.) She stated she spends hours doing this, and has missed appointment because of her inability to stop. (A.R. 51.) She reported she feels like a "freak" doing it, but she cannot walk away. (*Id.*) If she tries to quit, she gets sweaty, cries, feels disoriented, and feels like she is going to choke. (*Id.*) She stated she has an overwhelming sense that compels her to act in this way. (*Id.*) Plaintiff testified that it takes her 4-5 hours to shower, due to her rituals and the process of doing things in a certain way. (A.R. 56-57.)

Plaintiff testified that she also suffers from anxiety attacks. (A.R. 53.) When she has an anxiety attack, she starts sweating, her knees and hands shake, her mouth gets dry, and she feels disoriented. (*Id.*) She stated her heart races, her breathing is affected, and she feels like she might pass out. (*Id.*) She avoids stores due to her anxiety (*Id.*). But she also has anxiety attacks when she is at home,

particularly if she has an argument with the person she lives with.  (A.R. 54.)
Plaintiff estimated she has three anxiety attacks on a good week, and daily attacks
on a bad week.  (*Id.*)

Plaintiff stated that she writes lists of things she needs to do.  (A.R. 55.)
However, she has trouble actually completing tasks.  (*Id.*)  She indicated her
concentration and focus is good for a moment, but she cannot read because she
does not remember what she read.  (A.R. 56.)  But she is able to watch a 30-minute
television program and recall it the next day.  (*Id.*)  Plaintiff has a case manager
through the Mental Health Center who helps her complete all of her paperwork,
and who writes everything for her.  (A.R. 59.)

Plaintiff stated that she takes care of her son approximately 3 days a week,
but it depends on the week.  (A.R. 59, 63.)  If she is doing better, she tries to take
care of him more often.  (A.R. 63.)  She only takes care of him during the day.
(*Id.*)  Plaintiff indicated she is trying to get to where she is mentally able to take
care of him more often.  (A.R. 60.)  She stated that there are days were she "just
can't be a mom."  (A.R. 61.)

### 2.    Vocational Expert's Testimony

Delane Hall, a vocational expert, also testified before the ALJ.  (A.R. 63-
69.)  The ALJ asked Mr. Hall two hypothetical questions.  First, the ALJ asked Mr.
Hall to assume a person the same age as Plaintiff, and with the same work history

and educational background, who could understand remember, and carry out unskilled tasks of the specific vocational preparation of 2, and GED reasoning level of 2, who could maintain attention, concentration, persistence, and pace for such tasks for 8-hour workdays, and 40-hour work weeks, who could tolerate occasional interaction with supervisors, coworkers and the public, but could tolerate only occasional changes in a routine work setting.  (A.R. 65.)  Mr. Hall testified the hypothetical individual would be able to perform Plaintiff's past work as a housekeeper, as well as jobs in the national economy such as automotive detailer, agricultural sorter, small parts assembler, document preparer, and fabricated products finisher.  (A.R. 66-67.)

Second, the ALJ asked Mr. Hall to assume the same person but with the limitation that the person would be off task 20 percent of an 8-hour workday and 40-hour work week.  (A.R. 67.)  Mr. Hall stated the person could not perform Plaintiff's past work as a housekeeper, or any other jobs in the national economy.  (A.R. 67-68.)

Plaintiff's counsel asked Mr. Hall if a person who consistently has difficulty completing tasks would be able to perform even unskilled work.  (A.R. 69.)  Mr. Hall stated no, that such a person would likely be terminated.  (*Id.*)  Plaintiff's counsel then asked Mr. Hall if a person who spent up to several hours a day

sorting, checking, organizing and reorganizing would fit into the ALJ's second hypothetical of being off task 20 percent of the time.  (*Id.*)  He stated yes.  (*Id.*)

**B.    Medical Evidence**

The administrative record includes Plaintiff's medical records from several health care providers.  The Court has summarized only those records that are relevant to the specific issues presented for review.

1.    Treating Provider Evidence

a.    *Dr. Paolo F. Gerbasi, M.D.*

Plaintiff was treated by Dr. Gerbasi at St. Vincent Healthcare for approximately one year.  (A.R. 267-300.)  During that time, Dr. Gerbasi managed Plaintiff's medications, including Ritalin for ADHD.  (*Id.*)  In August 2013, Plaintiff reported the Ritalin was "working ok," but she felt that she needed something for depression.  (A.R. 274.)  The following month, however, she indicated the Ritalin was wearing off early and her attention would drop and she would get more disorganized.  (A.R. 278.)  Dr. Gerbasi increased her dosage. (A.R. 279.)

In December 2013, Plaintiff stated she felt like she was in a manic state all the time and was "a freaky mess."  (A.R. 286.)  She had increased her antidepressant on her own, and was using a lot of Klonopin.  (A.R. 286.)  Dr. Gerbasi noted Plaintiff exhibited pressured speech and her attention was easily

lost, but she redirected well. (A.R. 287.) Dr. Gerbasi counseled her regarding self-adjusting her medications without medical supervision. (*Id.*)

In January of 2014, Dr. Gerbasi saw Plaintiff for a hospital follow-up. (A.R. 290.) He noted that Plaintiff had recently been hospitalized after taking "a bunch of pills and alcohol."[1] (*Id.*) Dr. Gerbasi also noted she had a history of cutting, and recently began doing it again. (*Id.*) Plaintiff reported feeling sad and seeing no way out, and having a hard time remembering to do anything. (*Id.*) But Dr. Gerbasi noted that Plaintiff was doing better and was going to start seeing a psychiatrist when he last saw her in February 2014. (A.R. 300.)

b. *Dr. Mark Nicholson, M.D.*

Plaintiff established care with Dr. Nicholson in February of 2014. (A.R. 334-35.) She reported having trouble with concentration and attention. (A.R. 334.) She said she frequently makes mistakes, her work is frequently inaccurate, and she has trouble following through with tasks. (*Id.*) She also stated she fidgets, talks excessively and is easily distracted. (*Id.*) In addition, Plaintiff reported that she obsessively keeps things clean, frequently re-checks things, and will even return to her apartment to check things when she's trying to go somewhere. (*Id.*) Dr. Nicholson noted Plaintiff had long periods of depression and had attempted

---

[1] It does not appear that any records from this hospitalization were included in the Administrative Record.

suicide during those periods.  (*Id.*)  Dr. Nicholson adjusted her medications.  (A.R. 335.)

In June 2014, Plaintiff told Dr. Nicholson she was spending hours and hours a day excessively cleaning things, even if they didn't need to be cleaned.  (A.R. 332.)  He noted she had been having panic attacks, but a modest amount of Clonazepam had been effective in controlling them.  (*Id.*)  He diagnosed Plaintiff with panic disorder with agoraphobia, ADHD, and obsessive compulsive disorder. (*Id.*)  Dr. Nicholson noted Plaintiff continued to have very compulsive cleaning behavior despite her medications when he saw her in August 2014.  (A.R. 329.) He stated her concentration and attention were distractible, and her associations were flighty.  (*Id.*)

In October and December 2014, Plaintiff continued to report attention problems and mood problems to Dr. Nicholson.  (A.R. 328.)  Plaintiff reported that her anxiety made her feel like she "can't think straight," or was "like a deer in the headlights."  (A.R. 326.)  Plaintiff also stated she was obsessed with germs, and felt compelled to strip her bedroom and clean it with bleach every three days. (A.R. 324, 326.)  Dr. Nicholson noted her associations go off topic, and that her attention and concentration required frequent reorientation.  (A.R. 235, 328.)

In January 2015, Dr. Nicholson noted Plaintiff had used loud profanity toward the nursing staff when asked to provide a urine sample during her prior

visit in December.  (A.R. 232.)  He informed her that if she didn't behave in a

cooperative manner with his staff, he would ask her to seek care elsewhere.  (*Id.*)

In April 2015, Dr. Nicholson noted Plaintiff still had a lot of compulsive

behaviors, and that cleanliness and tidiness were problematic for her.  (A.R. 339.)

He further noted she could not focus, was very verbose, her associations were

rambling, and her attention and concentration were distractible.  (A.R. 339-40.)  In

May 2015, Plaintiff continued to report trouble being sidetracked and having "high

speed" thoughts.  (A.R. 338.)

       c.     *Dr. Marcia M. Taylor, M.D.*

In August 2015, Plaintiff started seeing Dr. Taylor at Big Sky Psychiatric

Services, PC.  (A.R. 470-74.)  Plaintiff indicated she thought her medications were

somewhat helpful in controlling her symptoms, but she felt like her ADHD was a

big problem.  (A.R. 470.)  She reported having difficulty concentrating, focusing,

staying on task, and had a hard time getting anything done.  (*Id.*)  She said she

would like to be able to read a book, but has to reread the same page several times.

(*Id.*)  She was also easily frustrated.  (*Id.*)  Plaintiff explained that her moods

change quickly, and she will have depressive episodes followed by episodes of

euphoria and grandiosity.  (A.R. 471.)  Plaintiff also complained of obsessions and

compulsions, such as repeatedly checking the stove or door.  (*Id.*)  Plaintiff stated

she spent 3-4 hours a day checking things.  (*Id.*)  She also described restacking

wood if it was not placed in a certain pattern. (*Id.*) Dr. Taylor screened Plaintiff for common DSM IV diagnoses, and found she had significant symptoms of depression, generalized anxiety disorder, panic disorder, social anxiety disorder, obsessive-compulsive disorder, PTSD, bipolar disorder, eating disorder, ADHD, and personality disorder. (*Id.*) Dr. Taylor noted Plaintiff had pressured speech and impaired attention. (A.R. 473.)

In October 2015, Plaintiff reported she was doing "pretty well," but her anxiety had been worse. (A.R. 453.) She also asked for a change in her ADHD medication because she felt a prior regimen worked better. (*Id.*) She stated she had been unable to complete some worksheets her therapist gave her because she could not focus or concentrate on them. (*Id.*)

In November 2015, she again reported doing "pretty well," but was having side effects from her mood stabilizer, so Dr. Taylor changed her medication. (A.R. 448, 452.) In December 2015, however, Dr. Taylor noted Plaintiff was not doing well on the new medication. (A.R. 443.) Plaintiff reported that she was more irritable with low frustration tolerance, and she was throwing temper tantrums. Although she knew her behavior was inappropriate, Plaintiff stated she "just can't help it." (*Id.*) Dr. Taylor changed her mood stabilizer again. (*Id.*)

In January 2016, Plaintiff felt like her moods were better and her medications were working well. (A.R. 438.) However, she had recently been

diagnosed with a pituitary tumor. (*Id.*) The following month, Plaintiff's endocrinologist recommended that she discontinue the mood stabilizer due to the tumor. (A.R. 437.) Therefore, Dr. Taylor changed her medications again. (*Id.*) Two weeks later, Plaintiff reported doing worse, and having more outbursts. (A.R. 432.) On March 1, 2016, Plaintiff called Dr. Taylor because she having mood swings, feeling depressed, and was having increased suicidal ideations. (A.R. 430.) Dr. Taylor instructed Plaintiff to go to the emergency room. (*Id.*) Plaintiff did so, and she was admitted to the hospital for a week. (A.R. 410-26.)

In April 2016, Plaintiff told Dr. Taylor that she had not been doing well since being discharged from the hospital. (A.R. 522.) She complained of being angry all the time, depressed, wanting to isolate, and had more thoughts of cutting herself. (*Id.*) Plaintiff also indicated her ADHD medication was not working because she was not able to focus or concentrate. (*Id.*) Dr. Taylor again adjusted her medications. (A.R. 526.)

In June 2016, Plaintiff reported her anxiety and depression had improved, but the medications were causing significant weight gain. (A.R. 529.) Over the following few months, Plaintiff stated she was doing "okay," but had erratic moods, was more irritable, had angry outbursts, and felt like she "freaked out" often. (A.R. 534, 540, 547.) She also continued to gain weight. (*Id.*) In October

and November 2016, Dr. Taylor noted Plaintiff was having a lot of anxiety (A.R. 552, 557.)

        d.    *Summer Peterson, LCPC*

Plaintiff saw Summer Peterson at the Mental Health Center for counseling for approximately a year. (A.R. 358-77; 562-72.) At Plaintiff's first therapy session in June 2015, Ms. Peterson noted that Plaintiff has many stressors in her life, and that she presented as highly anxious and her functioning was questionable. (A.R. 358.) In July 2015, Ms. Peterson stated Plaintiff was "mentally unstable, impulsive," and had impaired short term memory. (A.R. 360, 362.) Plaintiff reported that she had been in a difficult depression cycle, and had been having a hard time remembering to take her medications. (A.R. 362.) Ms. Peterson also noted that not having a job was an extreme stressor for Plaintiff. (*Id.*)

In August and September 2015, Ms. Peterson noted that Plaintiff's functioning was low. (A.R. 364, 366.) In October 2015, Ms. Peterson stated Plaintiff was having depressive/anxious cycles and was reportedly struggling with severe anxiety. (A.R. 368.) At that time, Ms. Peterson stated Plaintiff's attention was fair, but she changed subjects quickly. (*Id.*)

In November 2015, Plaintiff told Ms. Peterson that she was concerned about her short-term memory with regard to taking medications and making appointments. (A.R. 370.) Ms. Peterson noted Plaintiff's mood cycled between

depression and manic episodes, and indicated her functioning varied depending on her mood state. (*Id.*)

In December 2016, Ms. Peterson noted Plaintiff's finances continued to be a major stressor for her, and stated Plaintiff was "not mentally stable enough to pursue full time employment. . . ." (A.R. 371.) She further noted that Plaintiff had her son more often, but at times found it very overwhelming. (*Id.*) Ms. Peterson indicated that although Plaintiff had been sober for a year, she still suffered greatly from her mental illnesses. (*Id.*) Plaintiff reported that she was continuing to experience mood swings, and had days where she was unable to get out of bed and other days when she had high amounts of energy. (*Id.*)

In January 2016, Ms. Peterson indicated Plaintiff's functioning was questionable. (A.R. 374, 376.) In March 2016, Ms. Peterson noted Plaintiff had recently been discharged from the hospital for being suicidal, having high anxiety, and being in a deep state of depression. (A.R. 563.) Ms. Peterson stated Plaintiff was not emotionally, mentally or physically stable at that time. (*Id.*) She described Plaintiff as having a low mood, no energy, fatigued and having "mind fog." (*Id.*)

In April 2016, Ms. Peterson noted Plaintiff was still unstable, largely due to the compounding stress she was under. (A.R. 565.) Plaintiff reported she was helping take care of her son, and that it helped her emotionally. (*Id.*) The

following month, Ms. Peterson indicated Plaintiff was emotionally overwhelmed with her physical health issues and living situation. (A.R. 567.) Ms. Peterson did note, however, that Plaintiff was staying on top of her appointments, commitments, and responsibilities, and staying sober. (*Id.*)

In June 2016, Plaintiff appeared over-medicated at her appointment. (A.R. 569.) Ms. Peterson noted Plaintiff was very low functioning, and demonstrated slow cognitions, inability to think clearly, was "heavy minded," and was having memory difficulties. (*Id.*) In July 2016, Ms. Peterson noted Plaintiff was on the verge of homelessness because she was being forced to leave her living situation. (A.R. 571.) Ms. Peterson indicated Plaintiff was not stable enough to work consistently, and she had no income. (*Id.*)

On May 4, 2016, Ms. Peterson wrote a letter opining that over the previous six months, she had observed Plaintiff digress in her mental and physical health progress. (A.R. 506.) Ms. Peterson stated Plaintiff did not have the ability to provide for herself or the ability to work full time because of compound stress factors that increase her mental and medical health hardships. (*Id.*) Ms. Peterson noted that Plaintiff had recently been admitted to the Billings Psychiatric Unit for being suicidal. (*Id.*) Ms. Peterson concluded that getting approved for disability would help provide a stable income and allow Plaintiff to provide for herself and

her children.  (*Id.*)  She also noted that Plaintiff had stayed sober for over 18 months, and expected her to continue to remain sober.  (*Id.*)

e. *Hospitalizations*

Plaintiff was hospitalized two times between 2014 and 2016 for psychiatric issues.[2]  First, on April 25, 2014, Plaintiff went to the emergency room because she was depressed, had been cutting herself, and was having suicidal thoughts.  (A.R. 301.)  Plaintiff was admitted to the hospital.  (A.R. 306.)  During the psychiatric evaluation, Plaintiff was agitated, irritable and impatient.  (A.R. 308.)  It was also noted that she had a significant number of lacerations on her arms and legs from cutting herself.  (*Id.*)  Plaintiff reported that she had a history of trying to harm herself by drinking Clorox drain cleaner in 2011.  (A.R. 311.)  Plaintiff also stated that she felt her memory was impaired and she was having significant problems with concentration.  (A.R. 313.)  The nurse practitioner noted that during the evaluation, Plaintiff expressed the need to alphabetize some videos that were on a shelf, and she started doing so until she was asked to stop.  (*Id.*)  Plaintiff was hospitalized for three days.  (A.R. 320.)

The second hospitalization was on March 1, 2016.  (A.R. 410.)  Plaintiff went to the emergency room because she was experiencing increased depression

---

[2] It appears Plaintiff was also hospitalized for psychiatric reasons in late 2013.  (*See* A.R. 290 (progress note from Dr. Gerbasi dated January 10, 2014, stating Plaintiff "[l]eft hospital on 12/26 after taking a bunch of pills and alcohol").)

and suicidal thoughts following medication changes.  (*Id.*)  Plaintiff was admitted for safety, and stayed for 7 days.  (A.R. 418, 424.)  The admission notes indicate Plaintiff was considerably anxious, and described her life as "spiraling out of control."  (A.R. 413.)

### 2. Examining Physician Evidence

#### a. *Tristan Sophia, Psy.D.*

On June 9, 2015, Dr. Sophia examined Plaintiff and completed a Psychological Evaluation.  (A.R. 341-44.)  Plaintiff reported that she had a history of chronic depression, self-harm (i.e. cutting), and multiple suicide attempts.  (A.R. 342.)  Dr. Sophia found Plaintiff's attention and concentration were impaired, but that her mental status was otherwise generally unremarkable.  (*Id.*)

In terms of functional limitations, Dr. Sophia stated Plaintiff can complete activities of daily living independently.  (A.R. 343.)  Dr. Sophia found Plaintiff's social functioning was "at least moderately limited."  (*Id.*)  Dr. Sophia further stated that Plaintiff "has an impaired ability to sustain focused attention long enough to allow a timely completion of tasks."  (A.R. 344.)  She also noted that repeated episodes of decompensation "appear evident in [Plaintiff]."  (*Id.*)  In summary, Dr. Sophia opined Plaintiff's "ability to engage in work related activity currently is inhibited due to her depression, personality disorder, and distractibility.

She would need on-going psychological and psychiatric treatment to potentially become a reliable employee." (*Id.*)

3.    Non-Examining Physician Evidence

a.    *Marsha McFarland, Ph.D.*

Dr. Marsha McFarland reviewed Plaintiff's medical records, but did not examine her, and did not testify at the hearing. She issued an opinion on July 21, 2015. (A.R. 79-80.) Dr. McFarland noted there was evidence of an anxiety-related disorder and personality disorder. (A.R. 79-80.) She stated Plaintiff had recurrent obsessions or compulsions that are a source of marked distress, and she has intense and unstable interpersonal relationships and impulsive and damaging behavior. (*Id.*) Dr. McFarland opined that Plaintiff had mild limitations in activities of daily living; she had moderate limitations in social functioning and maintaining concentration, persistence or pace; and she had one or two episodes of decompensation. (A.R. 80.) Dr. McFarland opined, however, that Plaintiff's mental impairments did not prevent all types of work. (A.R. 80-81.) Dr. McFarland stated Plaintiff can do work of a limited complexity, which does not require intense concentration and which is low stress and solitary in nature. (A.R. 82.) She noted Plaintiff has a reduced stress tolerance, and therefore, opined that Plaintiff should not be expected to respond to frequent changes in the work setting. (A.R. 83.)

b. *Cynthia N. Smith, M.D.*

Dr. Cynthia N. Smith also reviewed Plaintiff's medical records and issued an opinion on May 24, 2016. (A.R. 95-101.) Dr. Smith agreed with Dr. McFarland's limitations upon reconsideration of the initial denial of Plaintiff's claim. (*Id.*) Dr. Smith found Plaintiff's allegations were partially consistent with the evidence of record, but that she retained the capacity to do work that can be learned in up to one month on the job, with low social demands. (A.R. 101.) Dr. Smith opined that Plaintiff does not meet or equal a listing. (*Id.*)

## C. The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of January 18, 2014. (A.R. 14.) Second, the ALJ found that Plaintiff has the following severe impairments: "polysubstance abuse; depression; anxiety; personality disorder; and attention deficit hyperactivity disorder (ADHD)." (*Id.*) Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments. (A.R. 16-17.) Fourth, the ALJ stated Plaintiff has the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember and carry out unskilled tasks up to a specific vocational preparation (SVP) level two and a general education development (GED) level of

two, and maintain attention, concentration, persistence, and pace for such tasks during an eight-hour workday and 40-hour workweek; tolerate occasional interaction with supervisors, coworkers, and the public; tolerate only occasional changes in a routine work setting; and make the necessary decisions and judgments for unskilled work.

(A.R. 18.)

The ALJ next found that Plaintiff is unable to perform any of her past relevant work. (A.R. 22.) Fifth, the ALJ found Plaintiff could perform other jobs that exist in significant numbers in the national economy in light of her age, education, work experience, and RFC. (A.R. 23-24.) Thus, the ALJ found that Plaintiff was not disabled. (A.R. 24.)

## IV.   DISCUSSION

### A.   The ALJ's Credibility Determination

Plaintiff argues that the ALJ's credibility determination was erroneous because the ALJ did not provide clear and convincing reasons for rejecting her testimony, and the ALJ improperly "cherry-picked" references from the record. Plaintiff further argues that her testimony was supported by the objective medical evidence. The Commissioner counters that the ALJ properly discounted Plaintiff's symptom testimony.

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or

impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so. *Id.* "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester*, 81 F.3d at 834)). *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the

lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004). However, the ALJ may not reject the claimant's statements about the intensity and persistence of their pain or other symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2).

Here, the first step of the credibility analysis is not at issue. The ALJ properly determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding her symptoms. The ALJ failed to do so.

The ALJ discounted Plaintiff's testimony on grounds that the treatment records and clinical observations did not entirely support her subjective complaints. (A.R. 19.) In reaching her conclusion, however, the ALJ selectively relied on the treatment notes. The ALJ seized on language in the treatment records indicating Plaintiff presented as "pleasant and cooperative," that a "normal mood and affect" had been observed, and that Plaintiff stated her medication and treatment were helping. (A.R. 19.) The Court finds the ALJ placed undue emphasis on such language, and took it out of the context of the treatment notes as

a whole.

For example, in one of the records the ALJ relied on, Dr. Nicholson did note Plaintiff presented in a "good" mood.  (A.R. 325.)  The very same note, however, also indicated her mood was volatile; Plaintiff required frequent reorientation; she had poor insight and judgment; and she had acted inappropriately with the nursing staff.  (*Id.*)

In addition, most of the references cited by the ALJ to Plaintiff being "pleasant," were simply generic introductory statements made by providers who were not evaluating Plaintiff for her mental health issues that Plaintiff was "a pleasant 35 year old female."  (*See* A.R. 514 (treatment note re: tooth pain); 589 (treatment note re: migraine headache); 645 (treatment note re: nausea and vomiting).

Indeed, the weight of the treatment records indicate the opposite of what the ALJ found.  The treatment records show Plaintiff was routinely observed as anxious (A.R. 296, 309, 358, 366, 372, 374, 376, 434, 445, 450, 454, 476, 473, 524, 531, 542, 554, 559, 573, 575, 581), depressed (A.R. 328, 362, 364, 372, 374, 376, 467, 473, 563, 569, 577, 579), being agitated or upset (A.R. 305, 362, 434, 445, 554, 559), having impaired attention (A.R. 287,  309, 311, 327, 328, 329, 332, 340, 434, 440, 445, 450, 454, 520, 524, 532, 537, 542, 554, 559), having pressured speech, rambling, or being loud (A.R. 287, 339, 358, 360, 368, 445, 450, 454, 467,

473, 542, 559, 575), and having questionable or low functioning (A.R. 358, 362, 364, 366, 563, 569).

The ALJ's citation to Plaintiff's statements that her medication and therapy were helpful were also taken out of context. For example, Plaintiff did report that "Vynase tends to work well." (A.R. 540.) But the ALJ ignored the rest of the sentence that stated "however, the effectiveness only lasts until about noon." (*Id.*) Plaintiff also reported she was still easily angered and prone to angry outbursts on the medication. (*Id.*) In another note relied on by the ALJ, Plaintiff did report she felt her "obsessions and compulsions have improved," but the remainder of that sentence states she still spends three-four hours a day checking things. (A.R. 471.) She complained of repeatedly having to check the stove and door, and having to re-stack wood in a precise pattern. (*Id.*) Additionally, although Plaintiff reported therapy was helpful, the same day she described significant issues with her concentration, focus, mood swings, depression, and obsessions and compulsions. (A.R. 470-71.)

Treatment records must be viewed in light of the overall diagnostic record. *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). When read as a whole and in context, the treatment records and clinical observations here do not undermine Plaintiff's testimony. Rather, they consistently reflect that Plaintiff continued to

struggle with ADHD, mood swings, and obsessive and compulsive behavior, despite some occasional signs of improvement.

As such, the Court finds that the ALJ's credibility finding is not supported by specific, clear, and convincing reasons.

## B. Evaluation of the Treating Therapist's Opinion

At the time Plaintiff's claim was filed, the Social Security regulations separated medical evidence into two categories: (1) "acceptable medical sources," which includes licensed physicians and licensed or certified psychologists; and (2) "other sources," which includes nurse practitioners, physician's assistants, therapists, and counselors. 20 C.F.R. 416.913(a), (d) (amended March 27, 2017). *Leon v. Berryhill*, 880 F.3d 1041, 1046 (9th Cir. Nov. 7, 2017) (noting that prior to March 27, 2017, opinions of "other sources," such as nurse practitioners were not given the same weight as a physician's opinions). Opinions of "other sources," are not entitled to the same deference. *Molina v. Astrue*. 674 F.3d 1104, 1111 (9th Cir. 2012). The ALJ may discount opinions from "other sources" if the ALJ gives "germane reasons" for doing so. *Id.*

As a licensed clinical social worker, Ms. Peterson is not an acceptable medical source but is rather an "other" source. 20 C.F.R. § 404.1513(d). The fact that Ms. Peterson is not an acceptable medical source is not, in and of itself, a germane reason to afford her opinion lesser weight. *Haagenson v. Colvin*, 656

Fed.Appx. 800, 802 (9th Cir. 2016) ("The only reason that the ALJ offered for rejecting their opinions is that they are not 'acceptable medical sources' within the meaning of the federal regulation. However, the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources.'")

The ALJ did discuss Ms. Peterson's opinion and noted that she stated outside stress factors exacerbate Plaintiff's mental and physical health. (A.R. 20-21.) But the ALJ discounted Ms. Peterson's opinion regarding Plaintiff's ability to work, because Ms. Peterson cited Plaintiff's unstable living arrangement and her need for stable income as factors supporting her opinion. (A.R. 21.) The ALJ explained "these considerations are not weighted in the disability evaluation." (*Id.*)

The Court finds this is a germane reason to discount Ms. Peterson's opinion. The Court therefore finds that the ALJ did not err with respect to Ms. Peterson.

### C.     Medical Expert Testimony

Plaintiff next argues the ALJ should have called a medical expert to give an opinion on whether Plaintiff's impairments met or equaled a Listing as directed by the HALLEX I-2-5-34. The Court finds the ALJ did not err in this regard.

An ALJ has discretion whether to consult a medical expert. 20 C.F.R. § 404.1527(e)(2)(iii). The Commissioner's operations manual provides that the need for medical expert opinion evidence is "generally left to the ALJ's discretion,"

except in three circumstances, including when the ALJ "is considering finding that the claimant's impairment(s) medically equals a listing." Hearings, Appeals and Litigation Law Manual (HALLEX) I-2-5-32(A); I-2-5-34(A)(1).[3]

This provision does not require an ALJ to obtain a medical expert when she is merely determining whether the claimant's impairments meet a listing. HALLEX I-2-5-34(A)(2) (providing that obtaining a medical expert opinion is "discretionary" when the ALJ is determining "whether a claimant's impairment(s) meets a listed impairment(s)"). If the rule were otherwise, the ALJ would essentially have no discretion and would be required to obtain a medical expert opinion in every case. But that is not required by the plain language of HALLEX I-2-5-34. *See Rudy v. Colvin*, 2014 WL 5782930, at *14 (S.D. Ohio Nov. 6, 2014), report and recommendation adopted, 2015 WL 1000672 (S.D. Ohio Mar. 5, 2015) ("An administrative law judge must consider whether a claimant meets or equals a medical listing in every case. If plaintiff is correct, rather than having discretion as to whether [to] obtain testimony from a medical expert, an administrative law judge would be required to have a medical expert in each and every case. The plain language of the provision relied upon by plaintiff

---

[3] The other circumstances, which are not relevant here, are when "the Appeals Council or Federal court ordered an ME opinion" and when "there is a question about the accuracy of medical test results reported, requiring evaluation of background medical test data." HALLEX I-2-5-34(A)(1).

[HALLEX I-2-5-34(B)] more likely requires the opinion of a medical expert in any case in which the administrative law judge makes a finding that a claimant's impairment equals a listing.").

Here, the ALJ relied on the voluminous medical record to make a decision on Plaintiff's claim for benefits. The ALJ did not consider finding Plaintiff's impairments medically met a Listing. Thus, the Court finds the ALJ reasonably relied on the medical opinions and evidence in the record, and did not abuse her discretion by not calling a medical expert.

**D.     Evaluation of the Examining Physician's Opinion and Whether the RFC Was Supported by Substantial Evidence**

Plaintiff contends that the ALJ improperly considered the opinion of the examining physician, Dr. Sophia. Plaintiff points out the ALJ gave Dr. Sophia's opinion significant weight, but then did not properly limit the RFC based on the opinion. In response, the Commissioner argues the ALJ properly accounted for Dr. Sophia's opinion in the RFC.

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.) The Commissioner applies a hierarchy of deference to these three types of opinions. The opinion of a treating doctor is

generally entitled to the greatest weight. *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830.

In her decision, the ALJ gave "the majority" of Dr. Sophia's opinion "significant weight," including her opinion that Plaintiff had an impaired ability to sustain focused attention long enough to timely complete tasks.[4] (A.R. 20.) The ALJ found Dr. Sophia was specialized in the mental health field and her opinion was based on a thorough examination and was supported by reasonable explanation. (*Id.*) The Court finds no error with regard to the weight assigned Dr. Sophia's opinion.

The problem arises, however, with regard to the RFC fashioned by the ALJ. Although the ALJ stated she gave Dr. Sophia's opinion significant weight, she did not properly account for the impairment regarding Plaintiff's concentration in the RFC. Dr. Sophia opined that Plaintiff was impaired in her ability to sustain focused attention and timely complete tasks. (A.R. 344.) But the ALJ stated Plaintiff had the RFC to "maintain attention, concentration, persistence, and pace for such tasks during an eight-hour workday and 40-hour workweek." (A.R. 18.)

---

[4] The ALJ stated she gave little weight to Dr. Sophia's opinion regarding episodes of decompensation. (A.R. 18.) Plaintiff does not contest the ALJ's determination on this point, and the Court finds the ALJ gave sufficient reasons for discounting this portion of the opinion.

The Commissioner argues the ALJ accommodated the impairments identified by Dr. Sophia by limiting Plaintiff to only unskilled work with a reasoning level of two.[5]  The Court finds this limitation is insufficient to account for Plaintiff's impairments in attention and concentration.

The Commissioner has not cited any authority to establish that a person with impairments in their ability to maintain attention and concentration will be able to perform the full range of unskilled jobs.  Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968.  This definition does not address the level of attention or concentration necessary to perform such work.  Indeed, skill level is not necessarily equivalent to mental functions.  *See e.g. Chapo v. Astrue*, 682 F.3d 1285, 1290 n.3 (noting mental functions "are not skills, but rather, general prerequisites for most work at any skill level.").  Moreover, the Social Security Administration has recognized that an individual's impairment-related limitations must be included in the RFC for unskilled jobs:

> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.  A

---

[5] The ALJ stated Plaintiff had the RFC to "understand, remember, and carry out unskilled tasks up to a specific vocational preparation (SVP) level two, and a general education development (GED) level of two."  (A.R. 17.)  SVP focuses on the amount of time needed to learn a job, and ranges between 1 and 9.  *See* 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:157 (2017).  GED rates the intellectual requirements needed to perform the job, and ranges from 1 to 6.  *Id.*

claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. . . . Any impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.

SSR-85-15, 1985 WL 56857.

Therefore, the Court finds the restriction to unskilled work did not adequately accommodate Plaintiff's attention and concentration limitations. *See e.g. Kruchek v. Barnhart*, 125 Fed.Appx. 825, 828 (9th Cir. 2005) (stating a limitation to unskilled work "could well require attention and concentration, as well as normal pace"); *Wiederholt v. Barbhart*, 121 Fed.Appx. 833, 839 (10th Cir. 2005) (holding a limitation to "simple, unskilled job tasks" was insufficient to incorporate "moderate difficulties in maintaining concentration, persistence, or pace").

Because the ALJ endorsed Dr. Sophia's opinion, but failed to consider all of the mental limitations identified by her evaluation, and did not give any reasons for doing so, the ALJ committed reversible error. *Kruchek*, 125 Fed.Appx. at 828.

When the ALJ included Plaintiff's impaired ability to sustain attention and stay on task in the second hypothetical, the vocational expert testified there were no jobs Plaintiff could perform. (A.R. 67-68.) Likewise, when Plaintiff's counsel asked the vocational expert if a person who consistently has difficulty completing tasks would be able to perform unskilled work, he indicated no. (A.R. 69.) Thus, the Court notes that had the ALJ properly accounted for Plaintiff's attention and

concentration impairment in the RFC, Plaintiff may have been found disabled at Step 5.  The Court will stop short of remanding for benefits, however, because the ALJ also gave significant weight to the opinions of Dr. McFarland and Dr. Smith.  (A.R. 20.)  Thus, the Court finds it is appropriate to allow the ALJ to reconcile these opinions, all of which she has given significant weight, in determining the RFC.

## V.    REMAND OR REVERSAL

Plaintiff asks the Court to remand this case for payment of benefits.  "The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court."  *Reddick*, 157 F.3d at 728.  If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand, the ALJ shall re-evaluate Plaintiff's credibility, reformulate the RFC based on Dr.

Sophia's opinion, and reconsider whether Plaintiff can perform work in the national economy based upon a hypothetical that incorporates of all of her impairments and limitations supported by the record.

## V.     CONCLUSION

Based on the foregoing, **IT IS ORDERED** that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**IT IS ORDERED**.

DATED this 18th day of September, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge